MISSOURI, K. & T. RY. CO. v. McCRARY et al.

(Circuit Court, W. D. Missouri, W. D.   August 16, 1910.)

No. 3,372.

1. INJUNCTION (§ 42*)—SUBJECTS OF RELIEF—UNLAWFUL CONTRACTS.

The unlawful sale of railroad tickets by a "scalper" will be enjoined, not so much for the protection of a railroad company, as for the protection of the public.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 42.*]

2. INJUNCTION (§ 225*)—VIOLATION—DEFENSES—DECOY.

It is no defense to contempt proceedings for the violation of a judgment of an injunction against the unlawful sale of railroad tickets by a "scalper" that the sale in question was to a decoy.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 225.*]

3. INJUNCTION (§ 232*)—VIOLATION—PUNISHMENT.

Where, after an injunction was served on a "scalper" against the unlawful sale of railroad tickets, his counsel in open court solemnly promised that, if the proceedings could be stayed, he would in good faith in the future obey the law and observe the injunction, but he subsequently willfully violated it, he will be punished by imprisonment in the county jail.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 519–528; Dec. Dig. § 232.*]

In Equity.   Suit for injunction by the Missouri, Kansas & Texas Railway Company against Harry A. McCrary and others.   Contempt proceedings for violation of injunction.

Ellison A. Neel, Lathrop, Morrow, Fox & Moore, Brode B. Davis, and Samuel W. Sawyer, for complainant.

John L. Wheeler, for R. B. Hawes (Harry Hawes).

SMITH McPHERSON, District Judge (orally).   The court having heard the evidence and the admission of the parties, and having considered all of the record of the case, which is made a part hereof, the court states that the questions of law and controversies with reference thereto in the opinion of this court have been fully and finally settled by the Supreme Court of the United States in the case of Bitterman v. Railroad Co., 207 U. S. 205, 28 Sup. Ct. 91, 52 L. Ed. 171.   It was pursuant to the opinion of the Supreme Court in the case referred to that this court, while I was presiding, issued the writ of injunction herein; the writ running against this particular defendant now before the court and others.

It seems to the court that the defendant and his counsel lose sight of one of the main propositions.   It is not simply a question of whether the railroad company is subjected to damage of and by itself.   It is a matter in which the public has a great concern.   Courts are cognizant of the fact that, generally speaking, it is the more ignorant class of persons, those least accustomed to travel as a general proposition, who can be induced to buy a ticket of these folks called "scalpers."   They do not know, oftentimes at least, what is a good ticket and what is not.   They usually find an advertisement and signs

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of these scalpers, and by the arts of persuasion and other inducements they buy these scalpers' tickets; the motive of the purchaser being the reduction in price. And it frequently happens that these ignorant persons will buy these tickets, which are out of date or spurious, requiring the crime of forgery to make them apparently good. And ignorant people will get on trains and will be ejected by the conductor, and oftentimes they are in great distress by having no money with which to proceed on their journey. They come back to the ticket scalper only to be told that the scalper knows nothing about it, sometimes denying all knowledge of the transaction; and the poor person has parted with his money, and there he is with nothing but experience.

The law not only allows, but requires, the railroad companies during convenient hours to have on sale legitimate tickets, which, when paid for, constitute a contract for the carrying of the person, and which, if violated by the railroad company, the purchaser of the ticket, the passenger, has a complete remedy at law for a breach of the contract, aggravated in damages if he is ejected from the train. Persons ordinarily accustomed to travel buy their tickets there, knowing their rights, and knowing the redress they will have if the corporation violates the contract and refuses to carry the person. So it follows that it is not simply a question of how much damage the railroad company suffers, but for the protection of the public that these men who have no right nor authority to sell tickets, persons who sustain no contractual relations with the railroad company, cease their practice. They get tickets from persons who have no right to sell them, and these ticket scalpers know that the parties have no right to sell them, and they know that they have no right to purchase them. But, in the face of such facts, they do purchase them, knowing that the crime of forgery must follow, namely, the forging of the name of the party who got the ticket at a reduction, tickets sold for these excursions and entertainments over the country, tickets sold for what they call "Homeseekers'" excursions and "Homecoming" excursions and kindred occasions for the sale of tickets at reduced fare, to be used within a limited time and by the particular party purchasing the same, and it is not the purpose and not the contract that these tickets can then be picked up and hawked about on the streets for sale to ignorant persons. It is for the protection of the public a good deal more than it is for the protection of the railroad company. The railroad company can protect itself by the conductor refusing to honor the ticket after investigation. The ticket itself can be an identification of the purchaser of the ticket, just as the signature to drafts and checks and notes; but if a railroad company asserts its right, and the conductor determines that this is a forgery, and the party who would be the would-be passenger is not the person to whom this ticket was sold, and for the purpose sold, the company through its conductor and employés on the train can eject the passenger. Then see what hardship follows. Some ignorant man or some ignorant woman is ejected from the train, subjected to all kinds of harassments and oppression, amounting almost to cruelty, and that places the railroad company in a bad plight for being a party to such oppression. That is no redress

to the would-be honest purchaser who seeks to ride and is made to believe that this ticket would entitle him to passage.

Such are the views of the Supreme Court as I understand it, and therefore become my views, taken from the Bitterman Case, decided as lately as December two years ago.

Now it is urged that this party is not in the wrong because this ticket was sold to a decoy. Now in a case closely akin to this by analogy is the post office case. They are coming up here at every term of court, as the Assistant United States Attorney who is here present well knows, and I know, and the members of the bar know. The post office inspectors are advised that some one is guilty of depredation of the mail, and the inspectors are put to work, and by a process of elimination they eliminate the clerks and carriers who are under suspicion, and finally get it down to two or three persons who are under suspicion, and they furnish the proof, not by what has been done, but by decoy letters. The person who will take hold of a decoy letter will be presumed to be the party who has committed these depredations in the past.

Now in this case there was a decoy, a man who was in the detective service. He represents himself to be a would-be passenger from Kansas City to Chicago. This defendant was suspected of being in the unlawful business. Without the slightest trouble this man purchased a ticket, made good by the defendant from Kansas City to Sedalia, then by the use of this spurious ticket over the complainant's road, from Sedalia to St. Louis. The fact that he was somewhat confused at first when on the witness stand is a matter of no consequence in my judgment, because it is conceded here that the Missouri, Kansas & Texas Railway has no line east of the Mississippi river. It does have a line from Sedalia, Mo., to St. Louis, Mo. It is conceded that the Chicago & Alton Railroad Company has a line from St. Louis, Mo., to Chicago. But the defedant has been required to show cause in a proceeding for contempt, and in his general denial, it is not stated that this man is not engaged in this business. So that it must be assumed that he, after going out of business for a time, comes back again and concludes that he will engage in this business that has been announced as unlawful by the injunction. Why doesn't he deny it? He is required to show cause. He has a place down here on Ninth street, advertises the place, makes it attractive to would-be purchasers of tickets, inveigling people into his place of business. That is not denied. What has he those signs there for?

The result is the court adjudicates him guilty of contempt, and adjudges that he be confined in the county jail for 90 days and pay all the costs of this action. I make this judgment one of imprisonment because heretofore, and since the injunction was served on him, in open court by counsel who then represented him, it was solemnly promised that, if the proceedings could be stayed, he would in good faith in the future obey the law and observe the injunction. He now shows himself to be a willful violator. Nothing short of imprisonment will teach many that the law and decrees of the court must be obeyed.